# UNITED STATES COURT OF APPEALS
# FIFTH CIRCUIT
_____

## NO. 2012 - 30584
_____

### JOYCE WHETSTONE,

**Plaintiff-Appellant**

v.

### JEFFERSON PARISH SCHOOL BOARD,
### KEVIN J. BIANCHINI, PHD; KAREN ORTENBERG, M.D.

**Defendants-Appellees**

_____

Appeal from the United States District Court
Eastern District of Louisiana
Civil Action No. 2:07-CV- 9704 L/3
United States District Judge Eldon Fallon
_____

## CORRECTED ORIGINAL BRIEF ON BEHALF OF APPELLANT

Respectfully Submitted:

/s/ *John-Michael Lawrence*
John-Michael Lawrence (8143)
John-Michael Lawrence, LLC
Energy Center - Suite 2900 - PMB 204
1100 Poydras Street
New Orleans, La. 70163-2900
(504) 585-7797 tel
(225) 744-8748 fax
**ATTORNEY FOR APPELLANTS**

**ORAL ARGUMENT REQUESTED**

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**
_____

**NO.  2012 -**
_____

**JOYCE WHETSTONE,**
                                    **Plaintiff-Appellant**
v.

**JEFFERSON PARISH SCHOOL BOARD,**
**KEVIN J. BIANCHINI, PHD; KAREN ORTENBERG**
                                    **Defendants-Appellees**
_____

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following list of persons and entities,

as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case.

These representations are made in order that the judges of this Court may evaluate possible

disqualification or recusal.

Appellant, Joyce Whetstone's counsel:  John-Michael Lawrence, N. O., Louisiana.

Appellee,  Jefferson Parish School Board's Counsel:

> Olden Toups
> Grant & Barrow
> 238 Huey P. Long Ave.
> P.O. Box 484
> Gretna, Louisiana 70054
> (504) 368-7888
> (504) 368-7263

> Kevin Bianchini, PHD

> Mr. Clarence F. Favret, III
> FAVRET, DEMAREST, RUSSO
> 1515 Poydras Street, Suite 1400

New Orleans, LA.  70112

Karen Ortenberg

Mr. Stephen Pizzo
BLUE WILLIAMS, LLP
3421 N. Causeway Blvd., Ste 900
Metairie, La.  70002
FAX 504 849-3875

s/ John-Michael Lawrence
John-Michael Lawrence (8143)
John-Michael Lawrence, LLC
Energy Center - Suite 2900 - PMB 204
1100 Poydras Street
New Orleans, La. 70163-2900
(504) 585-7797 tel
(225) 744-8748 fax

**ATTORNEY FOR APPELLANT**

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS...............................................ii

TABLE OF CONTENTS................................................................................iv

TABLE OF AUTHORITIES...........................................................................v

STATEMENT OF JURISDICTION.................................................................vi

STATEMENT OF THE ISSUES.....................................................................vii

STATEMENT OF THE CASE.........................................................................1

STATEMENT OF FACTS...............................................................................3

SUMMARY OF ARGUMENT........................................................................18

ARGUMENT AND AUTHORITIES...............................................................20

STANDARD OF REVIEW .............................................................................20

LAW AND ARGUMENT ...............................................................................20

**CONCLUSION**............................................................................................40

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**.........................

**PROOF OF SERVICE**..................................................................................

**RECORD EXCERPTS**

# TABLE OF AUTHORITIES

**Authority Cited**                                                      **Page(s)**

## <u>Cases</u>

*Justin Love, et al v National Medical Enterprises, et al*, No. 99-20656,
5th Cir. C.A. 230 F. 3d 765; 2000 U.S. App. LEXIS 26007;
48 Fed. R. Serv. 3rd (Callaghan) 217, October 16, 2000. ...............................................23

*Waldrip* v. *Gen. Elec. Co.,* 325 F.3d at 654 .............................................................26

*Zaragoza v. Dallas County,* civil action no. 3:07-cv-1704-k, USDC ND TEX, Dallas
Division, 2009 U.S. Dist. Lexis 59795, July 13,2009, decided, July 13,2009. .........29

*Patterson v. Yazoo City,* 2012 U.S. Dist. LEXIS 36351 (S.D. Miss., Mar. 19,2012)..30

<u>*King v Bryant*</u>, 01-1379 La. App. 3 Cir. (7/10/02) 822 So.2d 214 ...........................37

<u>*Walters v Rubicon Inc*</u>., 96CA2294, La. App. 1 Cir. (12/29/97) 706 So.2d 503........37

<u>*White v Monsanto*</u>, 585 So.2d 1205, 1209 (La. 1991)................................................37

<u>*Palmer v Transit Mgt. S.E.La*</u>., No. 98-0594, 2000 WL 41204, at *5
 (E.D.La. Jan. 14, 2000) ...............................................................................................37

## Statutes

29 C.F.R. § 1630.2(1) ...............................................................................................27

## Other Authorities

## JURISDICTIONAL STATEMENT

This Court has Appellate jurisdiction of this action under the Federal Rules of

Appellate Procedure 3 and 4 as this is a final judgment from the United States District

Court for the Eastern District of Louisiana and an appeal of right has been timely filed.

**STATEMENT OF THE ISSUES AND
ASSIGNMENT OF ERRORS PRESENTED FOR REVIEW**

I.      Whether Appellant's federal suit was filed timely.

      1.      Appellant was on disability and being treated by Appellee's health care providers until benefits were cut off and she was forced into retirement in October 2005.

      2.      Appellant filed her EEO complaint with the EEOC on April 6, 2006. R. Doc. 23-2.

      3.      The Court erred in ruling that Appellant's claim prescribed in light of the fraudulent concealment of Appellant's test results in 2001 and the findings of disability of Appellant's physicians after 2005.

II.     Whether Appellant has established a prima facie claim under the ADA, i.e., Whether the Court erred in ruling that there was no time that Appellant was qualified to work and that defendants were also aware of her disability

      1.      Whether Appellant's Need for an Accommodation in the form of a safe place to work Was Open and Obvious after the First Attack

      2.      Whether Appellees failed to act properly under the ADA after the first attack when Accommodation in the form of a safe place to work Was Requested by Plaintiff and the attacker's Grandmother, and whether this failure to act caused injury.

III.    Whether the Court Dismissed Bianchini and Ortenberg in Error

## STATEMENT OF THE CASE

This case arises out of two attacks on Plaintiff Joyce Whetstone, a Jefferson Parish special education teacher, by two of her students, and defendants' refusal to discuss accommodation in the form of a safe place to work after the first and second attack, defendants' subsequent concealment of medical testing and tests results of Appellant that supported her requests for accommodation in the form of a safe place to work, and Appellees' refusal to provide Appellant with an accommodation in the form of a safe place to work.    Appellant was attacked in February and March 2001, was placed on benefits and received treatment from Appellees until October 2005 when she was forced to retire and benefits halted.    Appellant timely filed with the EEOC on April 6, 2006, R. Doc. 23-2,  then timely filed this suit within the requisite time period after receiving a notice of right to sue.

The parties filed the following motions, which were addressed by the lower court's Order and Reasons Rendered March 27, 2012:

1.    Plaintiff s Motion for Summary Judgment (Rec. Doc. 103);

2.    Defendant's Motion for Summary Judgment (Rec. Doc. 126);

3.    Defendant's Motion in Limine to Exclude and/or Limit the Testimony of John Muggivan (Rec. Doc. 129).

As stated by the Court in it's opinion:

"The Court has pending before it cross-motions for summary judgment, as well as a motion to exclude Plaintiff's proposed expert witness.

1.    **First, Plaintiff moves for summary judgment in her favor**.

    a.    She argues that there is no genuine dispute of fact that she was disabled within the meaning of the ADA because she experienced post-traumatic stress disorder (PTSD) and other stress;

    b.    that she was otherwise qualified to continue to do her job;

    c.    and that Defendant failed to accommodate her disability and later wrongfully terminated her.

**Second, Defendant moves for summary judgment**.

    1.    It argues that as a matter of law Plaintiff was *not* disabled, was not qualified for her job, and did not ask for an accommodation.

    2.    Defendant also moves for summary judgment on Plaintiff's state-law claims, as well as limitations on available damages.

**Third, Defendant has moved to exclude or limit testimony** from John Muggivan, a

Licensed Clinical Social Worker identified by Plaintiff as an expert witness.

The trial court made the following rulings on the 27th day of March, 2012. :

"For the foregoing reasons, IT IS ORDERED that

    1.    Plaintiff's Motion for Summary Judgment is DENIED

    2.    Defendant's Motion for Summary Judgment is GRANTED IN PART with respect to the damages issue and with respect to Plaintiff s claims for discrimination and harassment under the ADA and her claims under Louisiana state tort law, which are DISMISSED WITH PREJUDICE.

    3.    To the extent that she still pursues claims for retaliation under the ADA and denial of due process, Plaintiff shall submit a brief on or before April 9, 2012 articulating why summary judgment on those remaining claims is not appropriate. "

This appeal was timely filed.

## STATEMENT OF FACTS

**I.     From the lower Court's opinion, R. DOC. 146, pages 1-3, the lower Court's Findings of Undisputed Facts**

"This case arises out of two attacks on Plaintiff Joyce Whetstone, a Jefferson Parish special education teacher, by two of her students.

\*          \*          \*

"Although this case as an extensive history both in this Court and in numerous related cases pending in state court, certain core facts relevant to the present claims are undisputed."

The following facts are taken directly from the Court's opinion:

1.     In February, 2001, Plaintiff had been employed by the Jefferson Parish Public School System for almost eighteen years as a special education teacher,

> the majority of which was spent teaching students with emotional disturbances and behavioral disorders.

2.     Around February 22, 2001, she was teaching mostly autistic middle school students, but would also be assigned students from other special education programs.

3.     On February 22, 2001, Plaintiff entered her classroom and was attacked by

an autistic student who weighed at least two hundred pounds.

4.     She was punched repeatedly on her right upper body, neck, upper right arm, right shoulder, and right breast.

5.     She crouched in a corner trying to protect herself during the attack.

6.     A teacher in the classroom next door became aware of the attack and successfully distracted the student.

7.     The head of the Special Education Department called the student away from Plaintiff's classroom, and the student left.

8.    *The record indicates that shortly thereafter, a meeting took place between Plaintiff, the grandmother of the student who attacked Plaintiff, and the principal of the school.*

9.    ***According to the Plaintiff, both she and the grandmother requested that the student be moved to a different class, but that request was denied***.

10.   *Plaintiff continued to work.*

11.   *On March 8, 2001, approximately two weeks after the first attack, Plaintiff took a group of students to a grocery store as part of a community skills education program, along with an assistant who was an elderly woman.*

12.   *Plaintiff requested that she not be required to take the student who had attacked her on February 22 to the grocery store; her supervisor denied that request, but Plaintiff nonetheless left the student behind.*

13.   *At the grocery store, a different student bit Plaintiff on the hand.*

14.   *Plaintiff remained at work for another week, until March 15,2001.*

15.   *On March 15, 2001, she was placed on disability leave pursuant to the opinion of a Dr. Sketchler that she was temporarily totally disabled on the basis of neck pain.*

16.   Plaintiff received "assault pay" pursuant to a Louisiana statute.

17.   *Plaintiff attempted to return to work for part of one day on October 30, 2001, but was sent home after the school nurse found that she had very high blood pressure.*

18.   Other than October 30, 2001, Plaintiff remained on disability leave through August or October, 2005 (it is unclear from the record) and did not work at all during that period.

19.   Plaintiff also alleges that she was terminated, but she does not state the specific day.

20.   The parties dispute whether Plaintiff was terminated or whether she took a medical retirement.

21.  Following the February 22 and March 8, 2001 attacks, Plaintiff began to receive medical treatment.

22.  She was initially referred by her Workers Compensation Carrier to Dr. Jeffrey J. Sketchler for evaluation and examination.

23.  Dr. Sketchler recommended further treatment and the Workers Compensation Carrier approved evaluation and treatment at the Medical Musculoskeletal Institute ("MMI").

24.  At the MMI, Plaintiff was treated by Dr. Kevin 1. Bianchini, a neuropsychologist, and Dr. Karen Ortenberg, a physician who is board certified in physical medicine and rehabilitation.

25.  *Plaintiff was treated by Dr. Ortenberg from December 5,2001, through until approximately March of 2004.*

26.  *While Dr. Ortenberg was treating the Plaintiff, the doctor was also communicating certain information about the treatment and Plaintiff s progress to the School Board and their Workers Compensation Carrier.*

27.  *These communications often contained opinions and recommendations about Plaintiff s progress and her ability to return to work under certain conditions.*

28.  On July 28, 2006, Plaintiff filed a state court Petition for Damages in the 24th Judicial District for the Parish of Jefferson which named Dr. Ortenberg as a defendant.

29.  On January 19, 2007, Plaintiff filed a Medical Review Panel Complaint with the Division of Administration. [Against Dr. Bianchini]

30.  On March 5, 2007, the state court granted an exception of prematurity and dismissed Plaintiff s claims against Dr. Ortenberg without prejudice.

31.  On December 19, 2007, Plaintiff filed the instant lawsuit in this Court, initially naming only the School Board as a Defendant. [1]

32.  *On September 30,2009, Plaintiff amended her complaint to include claims against Dr. Bianchini and on November 16,2009, she amended her complaint to include claims against Dr. Ortenberg.*

33.  In her Third Amended Complaint, Plaintiff asserted claims against all Defendants under the Americans with Disabilities Act ("ADA"), claims alleging constitutional violations of procedural and substantive due process, and state law claims for negligence, intentional infliction of emotional distress, and the breach of the standard of care owed by a doctor to their patient.

34.  Dr. Bianchini and Dr. Ortenberg filed motions to dismiss, which the Court granted on May 12,2010.

35.  The Jefferson Parish School Board is the only remaining Defendant and the case is set for trial.

II.  **The following are medical and treatment notes and deposition testimony by *Appellees'* health care providers, which show that *Appellant was disabled and able to work with the accommodation of a safe place to work between the first attack in February 2001 and her forced termination after October 2005:***

A.  *Medical Musculoskeletal Institute Intake Referral Form* (included in Ex. 2) **( R. DOC. 67-10)**

1.  Date of referral 11-29-2001

2.  Petitioner Whetstone is referred by Jefferson Parish School Board.   Jane Patton is the adjustor, Vivian Manes the case manager.

3.  *Treating physician is Dr. Jeffrey Sketchler*

---

[1]Appellant received a status letter in October 2005 ( R. Doc. _____ ) that forced her to retire.  Appellant timely filed with the EEOC on April 6, 2006 ( R. Doc. 23-2).  Appellant filed the instant matter in December 2007, timely under the Notice of Right to Sue.

4.      Initial evaluation date is 12-5-01

**B.      Dr. Bianchini**

July 19, 2010, deposition of Dr. Kevin Bianchini in Whetstone and Whetstone v Kevin J. Bianchini, Ph.D., et al, 24th JDC, No. 633-893, Div. L - Pages 1 - 13 **( R. DOC. 103-3)**

At pages 7 - 13 Dr. *Bianchini testifies that he informed defendant Jefferson Parish School Board that Petitioner needed to return to work with the simple accommodation of teaching away from dangerous students.*

February 23, 2011, deposition of Dr. Kevin Bianchini in Whetstone and Whetstone v Kevin J. Bianchini, Ph.D., et al, 24th JDC, No. 633-893, Div. L - Pages 46 50 **( R. DOC. 103-2)**

*Petitioner could have gone back to work shortly after the attack with the simple accommodation of keeping her away from dangerous students.*

June 25, 2001 report of Kevin Bianchini to Manes of the School Board. This report notifies the school board of petitioner's fear of the classroom, the students, the campus and the need for accommodations.  **R. Doc.**

**C.      Dr. Karen Ortenberg**

1.      Please see *Mar15,2002, Ortenberg report to Vivian Manes, RN, CCM.* **R. Doc. 74- 5.**

*Dr. Ortenberg reports that Appellant can return to work with a safe place to work, and that this element effects her recovery.*

2.      Also see Exhibit B - Deposition of Dr. Ortenberg **R. Doc. 84**:

*Page*          *Testimony*

90          Ortenberg states her reports that *Plaintiff is capable of returning to work physically. but was always in need of the kind of accommodation Petitioner initially requested but was denied.*

92-93   Ortenberg believes *Plaintiff is being honest about her symptoms and tears of returning to the same situation where she was attacked twice.*

97 *-100*      Ortenberg offered "her company's services" to treat Plaintiff, offered herself as the treating Orthopaedist, and her bills were paid by the School Board.

99             Ortenberg was Plaintiff's treating Orthopaedist, Ortenberg was not acting as an independent medical examiner.

*101-102*      *Ortenberg was aware that Plaintiff was afraid to return to work for (ear of being attacked again, and was aware that the accommodations Plaintiff initially requested after the attack (removal from the students who attacked her) was refused by the School Board*

*109-111*      Ortenberg was not aware that Plaintiff was attacked twice, *but was aware that, shortly after the attack, Plaintiff and the grandmother of the student who attacked Plaintiff requested removal of the student from Plaintiff's class and the principal refused*.

112-118, line 5
               *Ortenberg admits that providing the accommodation requested by Plaintiff shortly after the attack would have improved Plaintiff's recovery. and that the sooner it was provided the better.*

126            Ortenberg states that *when she writes in her reports that Plaintiff is able to return to work, she does not mean in the same class with the same student, but, rather, that Petitioner be accommodated by giving her a position without the danger of being attacked by the same and other dangerous students.*

127-128        Ortenberg testifies that *the "recommendations" in her reports are "accommodations" of the same type that Plaintiff initially requested, that is, teaching away from dangerous students.*

Dr. Ortenberg reported to defendants that plaintiff was qualified to return to work with the same accommodation plaintiff and grandma requested in Feb. 2001. Further, Dr. Ortenberg states that had plaintiff and grandma's accommodation been granted, plaintiff s recovery would have been tremendously different.

**R. Doc. 74-6**/Ex. C1

Report of Karen Ortenberg, M.D., defendant's orthopaedist/expert, dated July 26, 2002. **®. Doc. 74-6)**

*Petitioner is physically able to return to work if she receives the simple accommodation of teaching away from dangerous students.*

MMI initial report of Karen Ortenberg, M.D., dated December 5, 2001, to Vivian Manes, RN, CCM.   **®. Doc. 71-2)**

MMI report of Karen Ortenberg, M.D., dated March 13, 2002, to Vivian Manes, RN, CCM.   **®. Doc. 67-12)**

MMI report of Karen Ortenberg, M.D., dated January 2, 2002, to Vivian Manes, RN, CCM.   **®. Doc. 71-1)**

MMI report of Karen Ortenberg, M.D., dated March 3, 2004, to Vivian Manes, RN, CCM.   **®. Doc. 67-14)**

In all of her reports, Ortenberg reports to the School Board from the *initial examination of Plaintiff forward* that Plaintiff's psychological problems, *which could have been resolved by accommodations*, complicated Plaintiff's physical recovery and ability to return to work.

D.    ***Defendants' own Occupational Therapist:***

2.    ***Reports of Vivian McGinnis, Occupational Therapist, globo R. Doc. 106-4***

*1/16/02* - "As high stress levels and intense pain .. having negative impact on functional ability. As progress in OT very slow due to these factors *Pt would benefit form goal-directed vocational focus incl .. of alternative jobs as pt verbalized motivation to return to work, but will require support ... "*

*1/9/02*- "Discussion of RTW ... *pt verbalizing concern that she would not be able to work with children of any age ... did express motivation to explore opportunities in education other teachers within school system ex. reading specialist."*

*1/9/02* - "Staffing note". At meeting with defendants, *PT expresses need to have Whetstone go back to work with accommodations.*

*12/20/01* - Occupational Therapy Assessment - description of attack. Symptoms present. Referred by Ortenberg.

*1/3/02 - Patient wants to return to work, but not in a dangerous setting.*

*2/20/02 - Patient wants to return to work with an accommodation, recommended.*

December 2001 through January 2002 McGinnis reports that plaintiff can return to work with the accommodation plaintiff and grandma requested in February 2001. She is qualified and Needs the accommodation to handle an obvious disability that the defendants would understand if their own doctors did a diagnosis, *or if defendants did their duty in February 2001 after the attack and when Plaintiff and grandmother requested an accommodation immediately after the attack.*

### E.      *Reports of Jeffrey Sketchler, M.D. R. Doc. 103-8*

Dr. Sketchler also brought to the defendants' attention the need for the accommodation plaintiff and grandma first requested in February 2001, <u>that defendants intentionally refused</u>.

a.   *Oct. 31, 2001 - Whetstone upset because she wants to return to work and has been threatened with termination. <u>Attempted to return to work. nurse would not allow due to physical symptoms</u>.*

b.   *April* 12, *2002,* also Ex. A, R. Doc. 74-4 Sketchier reports, globo.

Report of Jeffrey J. Sketchier, M. D., dated *April* 12, *2002,* R. Doc. 74-4

Recommend - I have little else to offer this patient. *I think she may return to work if she is in a non threatening environment if this is possible.* But she should be eased back into work at only four hours a day and she should have the assistance of a psychiatrist. I will refer her to Dr. Bayer, if possible, and request this [sic] for evaluation and assisted treatment in the patient.

In April 2002, Dr. Sketchler reported to defendants that plaintiff can return to work in a safe environment. She is therefore qualified, this is another notice of disability and another notice of the accommodation needed that was requested by Plaintiff and grandmother after the attack in February 2001. After the attack, which has never been challenged, after the second trip and the second attack, which has not been challenged, and after Plaintiff and grandmother requested an

accommodation (a safe place to work), the defendants intentionally refused to even discuss

accommodations, and intentionally put Plaintiff back in harm's way.

**F.     *Dr. Roberts*, *Dr. Chester, Dr. Fiala***

> R. Doc. 103-5   February and March 15,2002, reports of Dr. James G. Roberts, are detailed
> in Muggivan's reports. Notes the anxiety with regard to return to work and
> need to accommodate petitioner by placing her in another environment.
> Historically, she was healthy and professional and competent.  February
> 2002 report of Dr. Roberts.  Between February and April 2002 Roberts
> recommends a safe working environment and medicine (equivalent of
> "psychopharmacologic" intervention recommended in August 2001)

> R. Doc. 103-5, R. Doc. 106-6 and 7
> Muggivan reports on medicals of Dr. Chester, Dr. Henderson and Dr. Fiala
> re Appellant's PTSD caused by the attacks and effect of the
> accommodation on Appellant had it been provided.

**G.     *Deposition of Appellant***

> R. Doc.        **August 11, 2009, deposition of Petitioner Joyce Whetstone**
> Deposition**:**

> Pages 5 - 12:        Appellant describes her day, duties and classes

> Pages 16 - 27:       Appellant describes the attack

> Pages 29 - 37:       Appellant describes the attack, the lack of
>                      response from management, and the principal's
>                      (Mayeux's) refusal of a safe place to work

> Pages 41 - 52:       Appellant describes the second attack.

## III.    Appellant's Uncontested Facts that are Unchallenged

1.     While employed by Jefferson Parish School Board as a special education
       teacher (hereinafter, "JPSB"), petitioner received severe injuries on
       2/22/2001 from an attack by an autistic student, who was more than six feet
       tall and weighed more than 250 pounds, causing her to become disabled

under the ADA.    (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c;5)

2.    When petitioner was assaulted on 2/22/2001, she had been employed with the Jefferson Parish Public School System (JPPSS) for almost 18 years as a special education teacher. Petitioner had spent three of these years teaching students with learning disabilities, one year teaching slow learners, and the remainder of the 18 years teaching students with emotional disturbances and behavioral disorders. .   (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c;5)

3.    Petitioner  enjoyed excellent health throughout this time, was rarely absent from work, received at least one award/commendation for excellent attendance, was able to be available for all duties assigned to me and had excellent ratings on yearly evaluations for competence and work performance.   .   (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c;5)

4.    At all times pertinent, the Jefferson Parish School Board met all requirements under the ADA to be subject to the ADA's sanctions for discrimination based on disability.

5.    At the time of the attack, Ms. Whetstone was teaching mostly autistic Middle School students but would sometimes be assigned students from other special education programs who might not be able to participate in certain school activities, such as physical education. .   (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c;5)

6.    On the day of the attack, as Ms. Whetstone entered her classroom she was attacked by an autistic student who was more more than six feet tall and weighed more than 250 lbs., punching her repeatedly on the right upper body - in the neck area, upper arm, under her arm when she raised her arm to protect herself, on the right breast, and on the right shoulder area. Ms Whetstone was crouched over in a corner trying to protect herself with her right arm throughout the attack.  (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

7.    **A teacher next door, Ms. Sherry Manes**, became aware of the attack and came to the classroom to give assistance. She distracted the student by waving a coat in his direction. This caused him to become distracted

and cease the attack. Ms. Manes escaped to her own classroom before the student could attack her. (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

8. **Karen Oldham, the Special Education Department head**, stood at the end of the hall and called the student to come to her and away from Petitioner's classroom. He ran to her. She kept him in her class until it was time to go home. (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

9. Petitioner was disabled under the ADA after receiving these injuries. (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5; 1 a & b; 2; 3; 4; B; C1; D; E; G; H; H1-2) **CONTESTED**

10. Petitioner's need for accommodations as a result of the initial attack were "open and obvious". (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5) **CONTESTED**

11. Petitioner requested reasonable accommodations after the initial attack, but was refused.  Petitioner requested a "safety to self and others" assessment of the attacking student before returning him to petitioner's classroom, and defendants refused. (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

12. The grandmother of the attacker requested, on behalf of petitioner, that reasonable accommodations be provided, but was refused.    **In the OEP committee meeting, both petitioner and the grandmother and guardian of the attacking student requested that the student be removed from petitioner's class.  Defendants refused.**    (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

13. Petitioner's need for the simple accommodation of being taken away form the risk of attack was open and obvious. (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5) **CONTESTED**

14. Petitioner was qualified for her position after her initial injuries had the defendant timely provided reasonable accommodations. (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5; B, pp 112-118)

15.     **Defendants refused the reasonable accommodations that were needed in an open and obvious manner, and refused the accommodations that were specifically requested, causing petitioner to suffer a second attack.**  (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5; B, pp 101-111)

16.     **Mr. Mayeaux rejected the request and ordered that the student remain in Petitioner's classroom.**  (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5; 2)

17.     On March 8, Petitioner was required to take her students to a grocery store as part of what is known as the community skills education program in which they were enrolled. The assistant, Ms. Theresa Brown, who had been assaulted just before Petitioner was attacked,  had not returned to work since the assault and had been replaced by another assistant. The replacement or substitute for Ms. Brown was an elderly woman named Ms. Eli.  (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5; 2)

18.     Petitioner was already having very high anxiety and fear at being required to be in a classroom with the student who assaulted her, especially since her assistant was an elderly woman. She feared that if the student attacked again there might be further injuries to herself, her assistant, to other staff persons, or to students.   (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5; 2)

19.     Petitioner was particularly afraid to take the student who assaulted her to the grocery store for the community skills program (Sav-A-Center" on Clearview Parkway).   Petitioner reported her fears to the principal but he rejected her request and ordered petitioner to take the student to the store with the other students.  (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

20.     **While at the store, Petitioner was attacked by another student who bit her on the hand, causing her to bleed.   Ms. Eli witnessed this assault by the other student and appeared to panic**. She took the other students to another aisle of the store while Petitioner attempted to calm the student who had attacked her.  (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

21.  Petitioner remained at work until March 15th although she was in a high state of anxiety, fear, and pain.  (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

22.  Petitioner's agitated state became evident to members of her family, school staff, medical staff, and friends, shortly after the first assault. Petitioner developed the unusual reaction to stress of trying to stay close to a wall - she was not able to walk in open spaces. See suffered extremely elevated blood pressure.  (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

23.  Some time after the first attack, Petitioner became alarmed at physical symptoms she was experiencing, such as sudden bouts of rapid heart rate, trembling, sweating, and fears that she might be dying. (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

24.  Petitioner would get bouts of high anxiety upon arriving at work and remain in a state of terror throughout the day. (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5; 2)

25.  Petitioner continued to have an urge to remain standing near a wall at all times. The school nurse, on one occasion, took her blood pressure and immediately recommended that she go to East Jefferson Hospital Emergency Room because it was so elevated.  (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

26.  Finally, Petitioner was emotionally unable to return to the school campus and became progressively more house-bound and isolated in her home.  (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5; 2)

27.  Petitioner continues, years later, to find it difficult to drive in the neighborhood of the school where she was attacked.   (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5)

28.  *     *     *

(1)  *After the attack, Petitioner requested a "safety to self and others" assessment of the attacking student.   Defendants refused.*

(2)    *Defendants ordered Petitioner to request an OEP committed meeting, in which the attacking child's grandmother and guardian was present. Both petitioner and the grandmother requested accommodations in the form of removing the attacking student from Petitioner's class. Defendant's refused.*

(3)    *Petitioner requested that she not be required to take the attacking student on a field trip after the attack. Defendants ordered her to take the child on the field trip.*

(4)    *Petitioner requested that she be placed in a position that did not require exposure to students that might commit a copy cat attack. Defendants refused. Petitioner was attacked by a second student on a field trip, who committed what is commonly called "imitative behavior".*

(5)    *On June 4, 2001, the report is dated June 25, 2001, defendants are notified by their own expert, Dr. Bianchini, of petitioner's fear of the classroom, students, campus and the seriousness of her injuries and fear. However, accommodations are still not discussed.*

(6)    *Dr. Bianchini, defendants' own expert, verbally told defendants that Petitioner needed accommodations in the same form (remover her or the student from the classroom, and Petitioner can go back to work).*

(7)    *The August 2001 report of defendant/employer's expert shows that petitioner has a fear of "anxiety-provoking situations" and **reccos** for interventions - "de-sensitizing interventions" and medicine, etc. - however, the need for accommodations is not addressed.*

(8)    *The December 2001 notes produced by the Occupational Therapist (Veneen McGuiness) show an extraordinary level of fear of he same working environment - employer representatives attended the medical staff meetings where this was discussed. However, still no accommodations discussed.*

(9)     *Dr. Roberts (February 2002) recommends a safe working*
        *environment and medication (the equivalent of the*
        *"psychopharmaceutical. The employer/defendant does not*
        *return his calls and does not pay his bill.*

(10)    *In March/April 2002 Dr. Sketchler recommends a safe working*
        *environment for petitioner. Defendant ignores the*
        *recommendation.*

(11)    *All medication and treatment plans were initially recommended*
        *by and carried out by defendants' experts (Bianchini, Bushman,*
        *Manes).*

29.     Once the initial opportunity to accommodate Petitioner was lost and her
        condition deteriorated, qualified health care providers again timely
        urged the defendants to provide easy, workable, available and non-
        disrupting accommodations to Petitioner but defendants, in bad faith,
        refused.  (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c;
        5; 1;  3; A; B; B1; C; C1; D; E; G; H; H1-2; K)

30.     Defendants' refusal to provide accommodations resulted in petitioner
        eventually becoming totally disabled.   But for defendants' refusal of
        timely accommodations, petitioner would have remained a healthy and
        productive employee.   (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2;
        4; 4a; 4b; 4c; 5; 1;  3; A; B; B1; C; C1; D; E; G; H; H1-2; K)

31.     Petitioner provided adequate notice under the ADA to defendant re her
        disabilities, the accommodations needed, the fact that the
        accommodations were available, and ample medical and treatment
        records and reports to show that petitioner's injuries, received on the
        job, caused her disabilities and continued to cause her disabilities.
        (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5; 1;  3; A;
        B; B1; C; C1; D; E; G; H; H1-2; K)

35.     Petitioner provided defendants with medical evidence and treatment
        evidence demonstrating that petitioner suffers from, among other
        injuries, Post Traumatic Stress Disorder as a result of the injuries
        received on job and that these injuries, and the PTSD in particular, have
        impaired more than one of petitioner's major life activities.  (Whetstone

Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5; 1;  3; A; B; B1; C; C1; D; E; G; H; H1-2; K)

36.     Defendant refused to engage in any interactive process to TIMELY accommodate petitioner's disability.   (Whetstone Depo at Ex. I, pp. 5-52; Exhibits 2; 4; 4a; 4b; 4c; 5; 1;  3; A; B; B1; C; C1; D; E; G; H; H1-2; K)

## SUMMARY OF ARGUMENT

Appellant's suit was timely filed.  Appellant has established a prima facie claim under the ADA, the Court erred in ruling that there was no time that Appellant was qualified to work and that Appellees were also aware of her disability.  Appellant has shown that the Appellant was qualified to work, and Appellees were given notice of her being qualified to work, her disability, and need for safe place to work.  Appellant received a status letter in October 2005 ( R. Doc. 103-5; 106-6&7) that forced her to retire.  Appellant timely filed with the EEOC on April 6, 2006 ( R. Doc. 23-2).  Appellant filed the instant matter in December 2007, timely under the Notice of Right to Sue.  Therefore, there is no prescription issue as Appellant filed all claims timely.  Further,

1.     It is undisputed and a finding of fact by the Court that immediately after first attack and after the second attack an accommodation in the form of a safe place to work was requested by Appellant and Grandmother of attacker - Appellant was qualified to work away from violent children.

2.     Dr. Bianchini fraudulently concealed certain tests administered to Appellant and the results that supported her initial and subsequent requests for an accommodation in the form of a safe place to work.

3.     Dr. Bianchini, School Board Doctor, Testified under Oath in the Worker's Compensation Case That He Notified School Board in 2001 That Appellant Needed an Accommodation (in the form of a safe place to work).

4.      The medical and rehabilitation and vocational rehabilitation records cited in Section II of the Facts show that Appellant was qualified to work in a safe place, and that this was known to Appellees, through the period from the first attack in February 2001 through Appellant's forced retirement after October 2005.

The Court erred in ruling that Appellees did not have notice of a need for accommodation immediately after the first attack and after the second attack, and a duty to act after the first attack.  Appellant's Need for an Accommodation in the form of a safe place to work Was Open and Obvious after the First Attack.  Appellees failed to act properly under the ADA after the first attack when an Accommodation in the form of a safe place to work Was Requested by Plaintiff and the attacker's Grandmother.  This failure to act caused injury.

Appellees not only refused to engage Appellant in a discussion re a safe place to work accommodation after the first attack, but forced her back to the same class and on field trip where the second attach occurred.    The School Board ignored the accommodations request and ignored their own internal procedures that would have produced the accommodation requested. (These procedures are covered in Law and Argument)

Finally, the Court Dismissed Bianchini and Ortenberg in Error.  The fraudulent concealment of Psychological Testing and Results of Psychological Testing by Bianchini and MMSI constituted Fraudulent Concealment of  PTSD and other Diagnoses that supported Appellant's need for a safe place to work, and caused

Appellant injury, and tolled prescription. Dr. Ortenberg was administratively negligent in her duty to Appellant since Ortenberg's Memos State That an Accommodation in the form of a safe place to work was needed, but Dr. Ortenberg Did Not Communicate That to the School Board. The School Board Doctors where negligent in that they Failed to Provide Any Diagnosis on Record of Appellant, which would have shown Appellant's need for the accommodation of a safe place to work.

The Doctors Seen by Appellant after 2005 Diagnosed PTSD as Result of the Attack, and PTSD constituted a disability under the ADA. Dr. Bianchini, School Board Doctor, Testified under Oath in Related Case That He Notified School Board in 2001 That Appellant Needed an Accommodation. Appellees failed to act and this failure to act under the ADA caused Appellant injury.

### *Standard of Review*

It is well settled that the standard of review on a motion for summary judgment is de novo, using the same standards as the District Court.

### ARGUMENT AND AUTHORITIES

**I.    Appellant's federal suit was filed timely.**

   **1.    Appellant was on disability and being treated by Appellee's health care providers until benefits were cut off and she was forced into retirement in October 2005.**

   **2.    Appellant filed her EEO complaint with the EEOC on April 6, 2006. R. Doc. 23-2.**

### 3. The Court erred in ruling that Appellant's claim prescribed in light of the fraudulent concealment of Appellant's test results in 2001 and the findings of disability of Appellant's physicians after 2005.

Appellant was on disability and being treated by Appellee's health care providers until benefits were cut off and she was forced into retirement in October 2005. (Court's Finding of Fact; R. Doc. 103-5; 106-6&7). Appellant filed her EEO complaint with the EEOC on April 6, 2006. ( R. Doc. 23-2) Appellant filed the instant complaint within the requisite time allowed by her notice of right to sue. *Therefore, there is no prescription issue*.

Prescription was further tolled by defendants' willful, intentional and fraudulent concealment of crucial tests results showing PTSD and the need for accommodations. John Muggivan's declaration ( R. Doc. 103-5; 106-6&7) set forth details re Dr. Bianchini's withholding of crucial tests and tests results which showed Appellant's disability and the need for a safe place to work (accommodation):

> "Dr. Bianchini first evaluated Mrs. Whetstone on June 4, 2001 (with a report issued June 25, 2001). He performed a second evaluation on or about November 4, 2003 (with a report issued January 23, 2004), and last saw her for the last time (sic) on April 24, 2005 (with a letter report issued June 10, 2005. These three reports are attached as Exhibits 2, 3, and 4 respectively". (McKinney)

> The above is from Don McKinney's Summary Judgment argument. The continuing refusal of Bianchini to produce Joyce's file until requested by Jirina around December 2005 may be what extends the prescription period beyond the prescription date claimed by McKinney. Ironically, Bianchini has not yet produced them – the un-redacted versions - for the mal-practice litigation and the School Board would not allow me to use them – or anyone to use them – in the WC case claiming they were not part of the record and were not properly

discovered. At the conclusion of the WC case Toups allowed them – the un-redacted versions - into the record but too late for testimony based on their contents. Not allowing them to be used by witnesses in the WC case harmed Joyce's WC case. The withholding of information is still a problem.

The McKinney account of Dr. Bianchini's involvement with Ms. Whetstone is significantly inaccurate.  The account leaves out the fact that a second evaluation of Ms. Whetstone was conducted on August 21, 2001 that included the administration of a number of psychological tests. Two of these psychological tests, the MMPI-2-TM and the MCMI-TM resulted in reports entitled the MMPI-2-TM Extended Score Report and the MCMI Interpretative Report. These reports are dated 8/21/2001 but were not produced or made available to any health care provider until December 2005 – 4 years and 4 months after they were generated. These 2 reports are listed herein as Exhibits 1 and 2. These reports - the un-redacted editions - contained a substantial amount of clinical information and a treatment plan for use by clinicians involved in Joyce's mental health care.

Sometime after these two reports were made available in December 2005, redacted versions were made available to the lawyer representing John Muggivan, LCSW in his defamation case and to the Jefferson Parish School Board. This latter statement is a deduction based on the fact that when the Jefferson Parish Public School Board later produced its file the file contained only redacted versions of the reports. Dr. Bianchini has acknowledged in deposition testimony that the redaction was conducted in his office. The date and time of the redaction is not certain but it is logical to suggest the redaction occurred after the reports were produced in December 2005 when un-redacted copies were produced and before the reports (redacted versions) were sent to attorneys involved in the litigation of the various cases. It is presumed, but it is not certain, that the Jefferson Parish School Board did not redact the copies of the reports produced by them but produced them as they had received them.

It seems the redaction was done when Bianchini became aware litigation was inevitable.

The McKinney history of evaluations conducted by Dr. Bianchini is also inaccurate regarding the evaluation completed in November 2003. The November evaluation also resulted in the production of two reports, namely, an MMPI-2-TM report and an MCMI-TM report entitled the MMPI-2-TM Extended Score Report and the MCMI Interpretative Report. Like the August

2001 reports these reports also contained valuable clinical information for the use of clinicians providing mental health care to Joyce.

These reports are listed as Exhibits 3 and 4. The depositions containing testimony on these 4 Exhibits are listed as:

Exhibit 5 (John Muggivan's Deposition, dated 3/20/2007);
Exhibit 6 (Joyce Whetstone's Deposition, dated   );
Exhibit 7 (Dr. Bianchini's Deposition, dated 8/11/2009;
Exhibit 8 (Dr. Bianchini's  Deposition, dated 5/6/2010);
Exhibit 9 (Dr. Bianchini's Deposition, dated 7/19/2010;
Exhibit 10 (Dr. Bianchini's Deposition, dated 2/23/2011.

Even at this advanced stage of the litigation underway the Defendant has not yet produced un-redacted copies of these 4 reports to Plaintiff. Is it now appropriate to ask the Defendant to produce certified copies of these un-redacted reports so that they can be forwarded to the Plaintiff's experts for examination and to assist them with their testimony.

MMPI-2(TM); Extended Score Report, Dated 8/21/2001
MCMI-III TM: Interpretative Report, by Theodore Millon, PhD, dated 8/21/2001
MMPI-2(TM); Extended Score Report, Dated 11/05/2003
MCMI-III TM: Interpretative Report, by Theodore Millon, PhD, dated 11/05/2001

These four reports are now included in John Muggivan's file on Joyce."

Fraudulent Concealment Tolled Prescription, see *Justin Love, et al v National Medical Enterprises, et al*, No. 99-20656, 5th Cir. C.A. 230 F. 3d 765; 2000 U.S. App. LEXIS 26007; 48 Fed. R. Serv. 3rd (Callaghan) 217, October 16, 2000.  The 5th circuit discussed the tolling of prescription because of defendants' refusal to disclose.  *Justin Love* supports Petitioners' position that their ADA claim has not prescribed due to defendants' intentional refusal to disclose and continued fraudulent efforts and

*fraudulent concealment* of the psychological testing and tests results received by

Appellees, which would have supported Appellant's ADA claim.

**II.     Appellant has established a prima facie claim under the ADA, i.e., the Court erred in ruling that there was no time that Appellant was qualified to work and that defendants were also aware of her disability**

See Court's Findings of Fact in Section I of Facts, particularly nos. 1 - 18, and

Uncontested Facts in Section III of Facts.

It is established that Appellants, knowing that Appellant was just attacked,

knowingly and intentionally refused to carry forth their duties under the ADA by even

having a discussion of a safe place to work accommodation, and even placed

Appellant in the same position of danger.  Defendant then ordered Plaintiff to take the

same group of students, including the 250 pound student who originally attacked her,

on a field trip with an elderly assistant, where Appellant suffered a second attack by a

second student.

In Section II of the Facts the citations to the medical records show that Appellant was,

in fact, disabled, that the School Board was told by their own health care personnel, shortly

after the attack, that Appellant needed the same accommodation the Appellant and

grandmother first requested, and the records are replete with notations from other health care

providers - Appellant's and Appellee(s)s' choice - stating that Appellant could return to work,

but needed a safe place to work), and that Appellant was, in fact, qualified to return to work

on many occasions between February 2001 and August 2005 if she was simply returned to a

safe working environment. *Please see section II, references to the medical records showing that Appellant was disabled and qualified to work in a safe working environment at various times throughout the period of time between February 2001 and October 2005. Further, see Muggivan's reports at R. Doc.* R. Doc. 103-5; 106-6&7, *showing that Drs. Henderson, Fiala and Roberts diagnosed Appellant with a disability requiring a safe place to work from the initial attack forward.*

1.    **Error:**

    **"The Court concludes that at no point during the period of alleged discrimination' can Appellant establish a genuine factual dispute as to all three elements of her prima facie case. "**

    The Court found that the scope of alleged discrimination began in 2001, after the first attack, and ended in late 2005, when Appellant received a status letter that led to forced retirement. The Court found that the Appellant and Grandmother of the attacker, after the first attack, requested an accommodation for the Appellant. Further, requests were made for evaluations under the School Board rules, all to no avail. *Appellees presented no evidence to negate the allegations of visible symptoms which, along with the requests from Appellant and grandma, made the need for a safe place to work open and obvious.*

    After first attack and request, as the Court points out, the Appellee(s)s had a duty to engage the Appellant in the need for accommodations. Appellee(s)s, instead, simply refused to even discuss the matter and ordered Appellant back to the exact

circumstances that produced the first injury. As the court points out, Appellant

continued to work and , therefore, was qualified to work. She simply needed to be

away from the class of students that could be violent, and Appellee(s)s intentionally

refused. The need to at least explore the need for accommodations was open and

obvious due to symptoms and the requests.   Appellee(s) were notified in February of

2001 or early March 2001, shortly after first attack, of the need for safety by Appellant

and Grandmother with a request to move the violent child or move Appellant. While

no doctor diagnosed PTSD at that time, the request by Appellant and the grandmother,

the fact that the attack took place in the class and was not questioned, the

unchallenged symptoms of Appellant ( See Facts, Uncontested Facts, Section III, nos.

13 - 27) gave "open and obvious" credentials **and** notice by Appellant of need for a

safe place to work (accommodation) or at least a duty to discuss it.   Appellant was

qualified to continue working since she did, with damage to her, continue to work.

Appellee(s) ignored the attack, ignored the results of the attack and ignored

Appellant's and grandmother's request for an accommodation. Appellee(s) ignored

their duty at this crucial time. Had Appellee(s) carried out their duty in February 2001,

the rest of the history of this case would not have occurred.  See Section II of the

Facts.

2.    **Error:**

**"Plaintiff has not raised a genuine fact issue that she was ever disabled
within the meaning of the ADA"**

Court:

> "This case implicates only the subsection (A) definition of disability, which requires three showings: that Plaintiff had an "impairment," that a "major life activity" was limited by the impairment, and that the impairment *"substantially* limits" that major life activity. *See Waldrip* v. *Gen. Elec. Co.,* 325 F.3d at 654.

### *Work is a major life activity*

"Major life activities" are "those activities that are of central importance to daily life, and activities that are central to the life process itself." *Waldrip,* 35 F.3d at 655 (quotations omitted). At all relevant times, regulations defined a "major life activity" as including" caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(1). Finally, the impairment must *substantially limit* a major life activity. This requirement "is the linchpin of see 12102(2)(A). Without it, the ADA would cover any minor impairment that might tangentially affect major life activities such as breathing, eating, and walking. For this reason, an impairment must not just limit or affect, but must *substantially* limit a major life activity." *Waldrip,* 324 F.3d at 655 (emphasis in original). "Permanency, not frequency, is the touchstone of a substantially limiting impairment." *Id.* (quotation omitted).

**3.      Dr. Bianchini, School Board Doctor, Testified under Oath in the Worker's Compensation Case That He Notified School Board in 2001 That Appellant Needed an Accommodation (in the form of a safe place to work).**

There is no question that PTSD is a disability under the ADA.   Bianchini stated Plaintiff needed a safe place to work, and continuously told Appellee(s)s, along

with other health care providers, that a safe place to work would enable plaintiff to recover from her injuries due to the psychological component. Further, Plaintiff was seen by school board psychiatrist Dr. Bushman who, amazingly enough, never made a diagnosis. WHY??

Once Plaintiff saw her own doctors (Chester, Muggivan, Fiala, Henderson), the defendants received reports that Plaintiff suffered PTSD in February 2001 and continued to suffer.  See  R. Doc. 103-5; 106-6&7, Muggivan reports.   Further, they reported that safe place to work is what Plaintiff needed to recover and address the psychological aspects of her PTSD and physical injuries. Defendants intentionally denied her a safe place to work when requested immediately after the attack and during all points in her so - called "treatment" as detailed in Attachment A, which shows notice of the disability, the disability, and Plaintiff's qualifications to work - simultaneously at many points in time.

**4.    Error:**

**"...and moreover there is no single point in time at which Plaintiff was qualified to return to work while Defendant was simultaneously aware of her PTSD (assuming for the sake of argument that the condition constitutes a disability under the ADA). "**

See detailed medical notes above showing that Appellant was qualified to return to work with a simple accommodation between February 2001 and October 2005.  The court concluded that the health care providers, particularly Ortenberg and

Bianchini, kept the School Board advised of the notations in Section II of the

Statement of Facts.

Also, as detailed above, defendants intentionally refused to carry forth their

duties under the ADA after the attack, second, Bianchini and Ortenberg gave

notification of the need to accommodate, third, Bushman refused to diagnose, fourth,

when medical evidence of PTSD was presented, defendants issued the "status letter"

and began the process of telling Plaintiff to work in the same environment or retire.

Clearly, in the beginning and at times subsequent, all three requirements were present.

Defendants intentionally refused to act.

This knowledge and notice remained the same throughout the history of this

case. From that point on, there were many times during the nightmare defendants put

Plaintiff through that she was able to return to work with the requested

accommodation. In fact, the medical record shows that this was crucial to her

recovery.       In the instant matter, Appellant refused to carry out their duties under

the law. *Zaragoza v. Dallas County,* civil action no. 3:07-cv-1704-k, USDC ND TEX,

Dallas Division, 2009 U.S. Dist. Lexis 59795, July 13,2009, decided, July 13,2009.

**5.    Appellant's application for disability was not fatal to her claim under the
        ADA**

Following the February 22 and March 8, 2001 attacks, Plaintiff began to

receive medical Treatment. She was initially referred by her Workers Compensation

Carrier to Dr. Jeffrey J. Sketchier for evaluation and examination. Dr. Sketchier

recommended further treatment and the Workers Compensation Carrier approved

evaluation and treatment at the Medical Musculoskeletal Institute ("MMI"). Plaintiff's

disability application and the collection of disability is irrelevant to the question of

Accommodations and Damages for refusal to carry out duties under the law. *See*

*Patterson v. Yazoo City,* 2012 U.S. Dist. LEXIS 36351 (S.D. Miss., Mar. 19,2012):

> "A. Whether Patterson's Factual Averments on his Disability Application
> Preclude His Argument That He Was Qualified for the Position of Supervisor
>
> While the present lawsuit was pending in this Court, Patterson filed a disability
> claim with the SSA. In his application for disability benefits, the Plaintiff
> represented to the SSA that he became unable to perform his job prior to the
> termination of his employment as supervisor. See, Patterson SSA Report at § 2.
> The SSA, after considering this evidence, determined that Patterson was in fact
> disabled and was eligible to collect SSDI benefits. See DDS Letter. The
> Defendants argue that Patterson cannot recover for his ADA and ADEA claims
> because specific statements on his SSA application estop him from now
> arguing
> that he is qualified for the position of supervisor.
>
>
> The present position in which Patterson finds himself is not uncommon. See,
> e.g., *Clevelandv. Policy Mgmt. Sys. Csuu;* 526 U.S. 795,119 S. Ct. 1597, 143 L.
> Ed. 2d 966 (1999); *Giles* v. *Gen. Elec. Co.,* 245 F.3d 474 (5th Cir. 2001);
> *McClaren* v. *Morrison Mgmt. Specialists. Inc.,* 420 F.3d 457 (5th Cir. 2005);
> *Reed* v. *Petroleum Helicopters. Inc.,* 218 F.3d 477 (5th Cir. 2000). Faced with
> a similar scenario, the Supreme Court held that receiving SSDI benefits and
> pursuing a disability claim under the ADA were not inherently contradictory
> positions and therefore receiving SSDI benefits does not "automatically estop
> the recipient from pursuing an ADA claim." *Cleveland,* 526 U.S. at 801. The
> Court found, however, that courts could not simply ignore the apparent
> contradictions between the two positions but should afford an ADA plaintiff
> the opportunity to explain contradictory factual assertions that would "at least

superficially appear to negate an essential element of the ADA case." _Reed_, 218 F.3d at 479 (citing Cleveland, 526 U.S. at 806). The plaintiffs explanation should be "'sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiffs good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation.'" _McClaren_, 420 F.3d at 463 (quoting Cleveland, 526 U.S. at 807). Typically, the e ADA's "reasonable accommodation" requirement affords the plaintiff enough room to maintain the position that he is by definition disabled under the Social Security Act but is qualified for his former position with reasonable accommodation. See, e.g., _Cleveland_, 526 U.S. at 807; _McClaren_, 420 F.3d at _464, Reed_, 218 F.3d at 479.

Patterson makes just such an argument. After a careful reading of the above precedent, the Court finds that Patterson's "reasonable accommodation" argument has merit. Patterson made limited specific factual assertions in his application for benefits to the SSA. See _McClaren_, 420 F .3d at 466 (noting that the difference between the Reed and Giles outcomes was the factual averments made to the SSA). The most substantive of these averments are: (1) "I am unable to do any physical work due my inability to walk" and (2) "I am not able to walk and drive." Patterson SSA Report at § 2. Neither of these factual assertions automatically disqualifies him for the job of supervisor.

As an initial matter, the superintendent job description does not specifically require either the ability to perform manual labor or the ability to walk or drive; instead, the job is entirely supervisory in nature. See generally, Superintendent Job Description. Nevertheless, in his deposition, Patterson stated that it was his custom as supervisor to perform manual labor alongside his employees. Patterson Depo. at 75-76. Further, as an example of the type of work the supervisor might perform, the job description states that the supervisor "may perform manual labor associated with grounds keeping and maintenance of facilities." Id. Just because Patterson routinely performed manual labor or that the supervisor sometimes "may perform" such labor does not override the consideration that the ability to perform physical labor is not an essential or even mandatory component of the supervisor's job. Therefore, Patterson's inability to walk is not fundamentally inconsistent with Patterson's assertion that he was qualified for his position.

Further, the Defendants suggest that Patterson's inability to drive would also undermine his qualification for his former position. Patterson also testified that a significant part of his job was, "go[ing] out every morning to see what need to be did; and if it's not done, [going] back that evening ... [to] check it." Id. at

75-76. While the inability to drive would presumably hinder his ability to supervise, transportation to and from work sites may be something that could be reasonably accommodated. The Court is not in a position to determine whether the [*50] Commission could reasonably accommodate Patterson's transportation needs, but it certainly cannot conclude that Patterson's inability to drive is a per se bar to performing the work of supervisor.

Yazoo City suggests that Patterson's "reasonable accommodation" argument is not available to him because he never requested accommodation. See E.E.O.C. v. Chevron Phillips Chern. Co., LP, 570 F.3d 606 (5th Cir. 2009). Yet, the City's reliance on this case is not helpful to its cause considering a plaintiff has the burden of requesting accommodation only "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer." See id. at 621 (quoting Taylor v. Principal Fin. Grp., Inc., 93 F.3d 155, 165 (5th Cir. 1996)). As the limitations arising from Patterson's disability should have been open, obvious, and apparent to the Commission, the burden would have rested on his employers to consider whether Patterson required reasonable accommodation.

Appellant's receipt of disability does not preclude her ADA claim. As presented shortly after the first attack, plaintiff could work and was qualified to work, defendants had notice of the attacks and requests for an accommodation and intentionally refused to act and, instead, defendants put plaintiff on benefits while ignoring their own medical personnel's reports of the need for a safe place to work. Plaintiff's receipt of benefits is not, especially in this case, inconsistent with her ADA claim.

Appellant's attempted to return to work for part of one day on October 30, 2001, but was sent home after the school nurse found that she had very high blood pressure. This shows that Appellant wanted to work and could work with the accommodation of a safe place

to work.

6.    **Error:**

**Plaintiff also alleges that she was terminated, but she does not state the specific day. The parties dispute whether Plaintiff was terminated or whether she took a medical retirement.**

See  R. Doc. 103-5; 106-6&7, Muggivan reports.  Plaintiff received a "status

letter" which was intended to "herd" her to retirement or termination. In effect,

Plaintiff had to return to work with no accommodation or be fired .... or retire.

Plaintiff chose retirement which, under these circumstances, was forced. *See*

*uncontested facts reproduced above and see Attachment A, R. Doc., pages* 31 - 33.

7.    **Error:**

**Second, Plaintiff must be a "qualified individual with a disability." That term is defined as "an individual with a disability who, *with or without reasonable accommodation,* can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added).**

Plaintiff was qualified to work away from violent students. As work is a major

life activity, the conclusion that Plaintiff must be able to work as though no injury

occurred in order to get a accommodation to accommodate the injury is an impossible

burden and, therefore, cannot be a correct interpretation of the law.

8.    **Error:**

**Plaintiff's alleged inability to return to work with special education students "would merely tend to show that [plaintiff] was unable to perform any job at one specific location, and is not evidence of [her]**

**general inability to perform a broad class of jobs."** *See id.* **at 287 (affirming grant of summary judgment). 34. b)**

Appellant could teach, just not teach non verbal, violent kids.  Location does not matter, the tasks matters. When PTSD was diagnosed is not the time defendant's duty surfaced. Defendant's duty surfaced when plaintiff and grandma requested an accommodation. Defendant's duty also surfaced when Bianchini and Ortenberg, their own psychologist and orthopaedist, told defendants that plaintiff needed to return to work with the same accommodation plaintiff and grandma requested in February 2001, FOR THE SAKE OF HER RECOVERY.

The record shows that plaintiff was qualified during several time periods between Feb. 2001 and October 2005, that defendant's had notice, and that plaintiff was disabled and in need of a safe place to work, and that all three coincided at various times. However, the most important time period is in February 2001, when defendants could have avoided the last ten years by at least discussing the accommodation requested after the attack.

Bushman and Bianchini, the defendant's psychiatrist and psychologist that plaintiff had to see to keep from being fired, should have FORMALLY diagnosed the PTSD in 2001.

Defendants should have acted when plaintiff grandma made their request, and when Bianchini advised them of the same accommodations need.

9.    **Error:**

**Plaintiff s argument that she was qualified if she had received an accommodation defeats her claim. In short, there is a fundamental inconsistency between Plaintiff's receipt of those disability benefits with her contention that she was simultaneously qualified to return to work. Plaintiff has not addressed that inconsistency, and on these facts it is fatal to her claim that she was qualified to return to work at any time after March 15,2001.[4] *See Patterson v. Yazoo City,* 2012 U.S. Dist. LEXIS 36351 (S.D. Miss., Mar. 19,2012), section: A. Whether Patterson's Factual Averments on his Disability Application Preclude His Argument That He Was Qualified for the Position of Supervisor, cited above.**

This is legal error. How can plaintiff return to work with the attacker in class?

How can we require that plaintiff be ABLE to return to work with the attacker in class

before she can request an accommodation that takes the attacker out of the class? To

say that a plaintiff must be able to work with the attacker, in spite of her condition

because of the attack, is saying that plaintiff has to be injury free to request an

accommodation because of that same injury. As cited above, WORK is a major life

condition that is affected by Plaintiff's injury. She cannot work with violent population

because of PTSD caused by the first attack and aggravated by the second. Related to

this, benefits for disability and claims under the ADA are not inconsistent, being

disabled and qualified to work is not inconsistent, and work is a major life activity.

***Further, see the above section which shows that applying for disability is not fatal to***

***an ADA claim.***

10.    **Damages and Intentional Infliction of Emotional Distress**

Appellee's argument on damages is opposed. The refusal to accommodate in the beginning, February 2001, was intentional. Ordering Plaintiff back in the same circumstances was intentional. Discrimination requires intent. None of the last ten years would have been necessary with ah accommodation in February 2001. Damages cover pain and suffering in the entire ten year nightmare.

In it's Opinion, the Court has already made the following factual findings (as numbered in Plaintiff's original memorandum, not in the Opinion): SEE COURT'S FINDINGS OF FACT NOS. 1 - 13.   It is established that Appellees, knowing that Appellant was just attacked as described above, knowingly and intentionally refused to carry forth their duties under the ADA, as articulated by the Court and in Appellant's memoranda, which are designed to protect Appellant from further attacks.

Appellees then ordered Appellant to take the same group of students, including the 250 pound student who originally attacked her, on a field trip with an elderly assistant.  Appellant left the student who attacked her behind with the aid of another teacher, but was attacked a second time.   Appellees' refusal, as found by the Court, and the remaining ten years Appellees put Appellant through a bogus process (as detailed in her original brief: Bianchini and Bushman did not even render a diagnosis, Ortenberg advised Appellant that it was not "their job to find her a job, Appellees ignored their own doctor's notes and reports that Appellant needed a safe place to work and that returning to work was crucial to recovery, etc.) is classic case of

intentional infliction of emotional distress, particularly given Appellees' knowledge

when the first request was made for a safe place to work.  Appellant has set forth

allegations more than enough to make an intentional infliction of emotional distress

claim.  *King v Bryant*, 01-1379 La. App. 3 Cir. (7/10/02) 822 So.2d 214; *Walters v*

*Rubicon Inc*., 96CA2294, La. App. 1 Cir. (12/29/97) 706 So.2d 503; *White v*

*Monsanto*, 585 So.2d 1205, 1209 (La. 1991) and *Palmer v Transit Mgt. S.E.La*., No.

98-0594, 2000 WL 41204, at *5 (E.D.La. Jan. 14, 2000).

**11.**   **The medical and rehabilitation and vocational rehabilitation records cited in the Facts of Dr. Bianchini, Dr. Ortenberg, Dr. Roberts, John Muggivan, Dr. Sketchler, Vivian Manes, show that Appellant was qualified to work in a safe place, and that this was known to Appellees.**

See statement of facts section II, medical records showing that appellant was

able to return to work with the simple accommodation of a safe place to work.  Also

see Appellant's uncontested facts in Fact section.

**II.**   **The Court erred in ruling defendants did not have notice of a need for accommodation immediately after the first attack and after the second attack, and a duty to act after the first attack:**

**Appellant's Need for an Accommodation in the form of a safe place to work Was Open and Obvious after the First Attack**

The injury was open and obvious for the reasons above stated.   The symptoms

after the attack were not challenged by the Appellees.  Appellees' had a duty once the

accommodation requested. Had Appellees performed their duties upon the initial

accommodations request, had Appellees listened to Bianchini and Ortenberg, had

Bushman and Bianchini done a diagnosis, none of the last ten years would have happened. Plaintiff would have returned to work and recovered from any injuries she suffered at that time.

In it's Opinion, the Court has already made the following factual findings (as numbered in Plaintiff's original memorandum, not in the Opinion): SEE COURT'S FINDINGS OF FACT 1 - 13.

It is therefore established that defendants, knowing that plaintiff was just attacked as described above, knowingly and intentionally refused to carry forth their duties under the ADA, as articulated by the Court and in Plaintiff's memoranda, which are designed to protect Plaintiff from further attacks.  See Plaintiff and grandmother's requests, then Bianchini's testimony, then Ortenberg, then Sketchler in Section II of the Facts.   Defendants ignored their duty to investigate and engage in accommodation discussions after the accommodation was requested in February 2001. Defendant intentionally ignored their duties under state and parish law and regs, as well as the ADA.   Appellees refused to engage Appellant in a discussion re accommodations after the first attack caused Appellant injury, but forced her back to the same class and on field trip where the second attach occurred.  See the Court's findings of fact nos. 10 - 15.

III.    **The Court Dismissed Bianchini and Ortenberg in Error**

The fraudulent concealment of Psychological Testing and Results of

Psychological Testing by Bianchini and MMSI constituted Fraudulent Concealment of

PTSD and other Diagnoses that supported Appellant's need for a safe place to work,

and caused Appellant injury.  The exhibits, facts and argument above regarding the

reports of Bianchini and Ortenberg are referenced in this section as though presented

in their entirety.  As stated in the exhibits filed previously, Dr. Bianchini, the

Appellees' psychologist,  testified that he advised the Appellees School Board that

accommodations were needed in 2001.

Also as previously noted, the school board, through Bianchini, conducted

testing of Petitioner in 2001, 2002 and 2003, however, these tests and test scores,

showing the need for accommodations, were withheld by Dr. Bianchini from

Whetstone' attorneys, and, possibly, from his own attorneys.

Appellant obtained these reports through Bianchini's disclosure of them to Dr.

Jirina Fiala in December, 2005.  These documents support Whetstone's claim of

fraudulent concealment by the Appellees, which support Petitioner's argument that her

claim did not prescribe due to fraudulent concealment by Appellees of her condition

and need for accommodations.

Dr. Ortenberg was administratively negligent in her duty to Appellant since

Ortenberg's Memos State That an Accommodation in the form of a safe place to work

is needed, but She Did Not Communicate That to the School Board.  See Dr.

Ortenberg's reports detailed above.  Dr. Ortenberg failed in administratively in her

duty to Appellant by failing to see that the accommodation she agreed Appellant

needed, a safe place to work, was properly communicated to the School Board.

The School Board Doctors where negligent in that they Failed to Provide Any

Diagnosis on Record of Appellant.  The Appellees failed to produce any diagnosis of

Appellant and withheld tests results.   The Doctors Seen by Appellant after 2005

Diagnosed PTSD as Result of the Attack, and Appellant's PTSD constituted a

disability under the ADA.  Dr. Bianchini, School Board Doctor, Testified under Oath

in Related Case That He Notified School Board in 2001 That Appellant Needed an

Accommodation, and Appellee's failure to act under the ADA cause Appellant injury.

## CONCLUSION AND RELIEF

Appellant had an open and obvious need for the accommodation of a safe place

to work.  She was qualified, Appellees had notice of her need, and Appellees ignored

her need for a safe place to work immediately after the first attack and after the advice

from Appellees health care providers that Appellant need a safe place to work to aid in

her recovery.

Respectfully Submitted:

_s/_John-Michael Lawrence_____
John-Michael Lawrence (8143)
John-Michael Lawrence, LLC
Energy Center - Suite 2900 - PMB 204
1100 Poydras Street
New Orleans, La. 70163-2900
(504) 585-7797 tel
(225) 744-8748 fax
E-MAIL - JMLaw122@cox.net

Mail:  18072 Forest Hills Dr.
          Prairieville, LA 70769

## CERTIFICATE OF COMPLIANCE

The measurements are:

Characters:   58,505

Words          11,231

Sentences      828

Lines          1,243

Paragraphs    280

Pages/Brief   47

_____

/S/John-Michael Lawrence

Attorney for Appellant

## PROOF OF SERVICE

I hereby certify that the attached documents(s) was (were) sent as indicated this day to each of the following:

E-MAIL DELIVERY September 20, 2012:
Jefferson Parish School Board
Counsel of record:
Olden Toups
Grant & Barrow
238 Huey P. Long Ave.
P.O. Box 484
Gretna, Louisiana 70054
(504) 368-7888
(504) 368-7263

Kevin Bianchini, PHD

Mr. Clarence F. Favret, III
FAVRET, DEMAREST, RUSSO
1515 Poydras Street, Suite 1400
New Orleans, LA.  70112

Karen Ortenberg

Mr. Stephen Pizzo
BLUE WILLIAMS, LLP
3421 N. Causeway Blvd., Ste 900
Metairie, La.  70002
FAX 504 849-3875


_____September 27, 2012_____          /s/John-Michael Lawrence
     Date                                                      John-Michael Lawrence
                                                           Representative for Appellants